In re CHANEY.

No. 1514.

District Court, W. D. Virginia, at Harrisonburg.

Nov. 4, 1947.

Joseph Nachman, of Mt. Rainier, Md., and Charles A. Hammer, of Harrisonburg, Va., for bankrupt.

L. W. ·H. Peyton and J. M. Perry, both of Staunton, Va., for lien creditor.

PAUL, District Judge.

This matter is now before the court for review of certain orders entered by the conciliation commissioner, petitions for review having been filed by both the bankrupt and the lien creditor. To a clear understanding of the situation now before the court it seems desirable to recite some of the prior proceedings in this case.

Prior to April 18, 1947, certain aspects of the case had been the subject of appeal by the bankrupt to the Circuit Court of Appeals of this circuit (Chaney v. Stover, 158 F.2d 604) as a result of which the cause was remanded to this court by a mandate which directed that a re-appraisal of the property be had and that the bankrupt be allowed thirty days thereafter within which to redeem the property at the value fixed on such re-appraisal; and that upon failure of bankrupt to redeem within such thirty day period, the property be sold for satisfaction of the mortgage indebtedness.

After receipt of this mandate this court, by an order of April 18, 1947, remanded the case to ·the conciliation commissioner with instructions to carry out the directions contained in the mandate of the appellate court. The commissioner, on May 17, 1947, held a hearing to consider the appointment of appraisers to make the

required appraisement, and at this meeting counsel for the bankrupt filed a petition averring that the conciliation commissioner was ineligible to hold the position of conciliation commissioner (on grounds which will be hereafter mentioned) and praying that he certify his disqualification. The commissioner denied the prayer of this petition and proceeded (May 17, 1947) to appoint three appraisers to make the reappraisement which had been ordered.

Counsel for the bankrupt did not object to any of the persons named as appraisers and did not protest or specifically object to the making of the re-appraisement. However, he did not otherwise waive his objection to the alleged disqualification of the conciliation commissioner, but on the contrary he filed (on May 26, 1947) a petition for review of the commissioner's action in declining to disqualify himself. This petition for review came before the court for consideration on June 6, 1947. In the meanwhile the appraisers had proceeded to the performance of their duties and had on June 3, 1947, filed their report. At the time (June 6) when the court had before it the bankrupt's attack on the eligibility of the commissioner, the report on the re-appraisement had been made only three days before. The customary hearing upon confirmation of the report and to consider any objections thereto had not been held; and, in fact, there had not elapsed the required time for notice of such hearing nor for the filing of exceptions to the report.

In this situation the court refrained from passing upon the question of the disqualification of the conciliation commissioner and entered an order (June 6, 1947) sending the case back before the commissioner, at the same time filing a memorandum in which the reason for this action was stated as follows:

"As it is now the court is asked to pass upon the question of the order under which the conciliation commissioner denied the prayer to certify himself as ineligible. Within a short while the question of the accuracy of the reappraisal will come before the conciliation commissioner on a hearing for that purpose. It may be that the appraisal will be accepted as a fair one by all parties concerned or some of them may have objections to it which this court will be asked to review. It seems best that all of these matters be acted upon at one time and, undoubtedly, such a course will tend to bring this case to a speedier conclusion.

"The proper course, therefore, appears to be to return the papers in this case to the conciliation commissioner with directions to proceed with the hearing on the reappraisal of the property. When this has been accomplished and if there are any objections thereto which this court is asked to review they can come up for review along with the question which has now been submitted to the court."

After the remand to the conciliation commissioner for the reasons above set out, there was held by him on June 18, 1947, and after due notice, a hearing for consideration of the appraisers report, which had appraised the value of the bankrupt's real estate at $12,500.00. At this hearing the mortgage creditor filed exceptions to the report on the ground that the value fixed therein was inadequate and less than the fair market value. Further hearing on the matters raised by the report and the exceptions was adjourned until July 7, 1947, and during the interim and on June 25, 1947, the bankrupt filed her exceptions to the re-appraisement on the ground that it was excessive. On the same date (June 25) the bankrupt filed a notice of appeal from the order of the court of June 6, 1947, in which the court had deferred acting on the question of the commissioner's eligibility.

At the hearing before the conciliation commissioner on July 7, 1947, he had before him the conflicting exceptions to the re-appraisement; the creditor contending that it was too low, and the bankrupt that it was too high. After hearing the extended testimony of a number of witnesses offered by both sides to support their respective contentions the conciliation commissioner, holding that the valuation ($12,500.00) reported by the appraisers was too low, entered an order on July 10, 1947, fixing the fair market value of the property at $15,000.00. Neither party has raised any question as to the right of the

commissioner to fix a value upon the property upon a hearing such as was had.

It appears, however, that neither party is satisfied with the valuation of $15,000.-00 and they have both filed petitions for review. The creditor seeks review of the commissioner's order of July 10, 1947, on the ground that the value fixed is less than the fair market value as shown by the evidence. The bankrupt seeks review of the same order on the ground that the valuation is excessive; and also prays for review of the commissioner's order of May 17, 1947, in which he denied the petition to disqualify himself; this being the same order of which a review was previously asked and on which the court, by its order of June 6, 1947, deferred action as hereinbefore set out.

Both of these petitions for review were forwarded by the conciliation commissioner to the court within the prescribed time after being filed and they have been before the court since about July 25, 1947. During the intervening time, however, there was pending before the Circuit Court of Appeals the appeal which the bankrupt had taken from the court's order of June 6, 1947, and it has been thought proper to defer action on the petitions for review pending the result of that appeal. Within recent days, however, the appellate court has dismissed the appeal as "fragmentary" and remanded the case. As the matter now stands, therefore, the court has before it the two questions presented by the petitions for review, (1) the eligibility of the conciliation commissioner, which is questioned by the bankrupt, and (2) the accuracy of the appraisement made by the commissioner, which is attacked by both parties. The situation before the court is just what it anticipated when, by its order of June 6, 1947, it sought to have both questions come before the court at one time. Action on these questions has merely been delayed by the futile appeal from that order.

### The Eligibility of the Conciliation Commissioner

The attack upon the eligibility of the conciliation commissioner is grounded on the provisions of the Bankruptcy Act, § 75, subsection a, 11 U.S.C.A. § 203, sub. a, to the effect that "No individual shall be eligible to appointment as a conciliation commissioner unless he is eligible for appointment as a referee * * * and (is) not engaged in the farm-mortgage business, the business of financing farmers or transactions in agricultural commodities or the business of marketing or dealing in agricultural commodities or of furnishing agricultural supplies." It is asserted that the conciliation commissioner is President and a director of the Staunton National Bank which in course of its business makes loans to farmers and at times secures such loans by liens on farm lands and equipment; and that the conciliation commissioner comes within the inhibition of being "engaged in the farm-mortgage business" or "the business of financing farmers."

The conciliation commissioner is Mr. Duncan Curry, a resident of Staunton, Virginia, at which place he is actively engaged in the general practice of law and has been for over thirty-five years. He was appointed a referee in bankruptcy of this court about eighteen years ago and has held that position continuously since. He has been a conciliation commissioner since shortly after the enactment of the law which created that position. He is also, I am informed, one of the Commissioners in Chancery of the Circuit Court of Augusta County, of which county the city of Staunton is the county seat. Except for these positions (which are in the line of his profession) and the connection with the bank which has been mentioned, he has no other profession or business than that of a practicing attorney. Some fifteen years ago Mr. Curry became a member of the board of directors of the Staunton National Bank, and two or three years later its President—a position which he still holds.

The Staunton National Bank is one of the smaller banks in Staunton and does what (for want of a better term) may be called a general commercial banking business. It is not a "small-loan" bank, nor a "farm-loan" bank, nor any other sort of specialized bank; it has no trust de-

partment. It is just an ordinary bank which receives deposits and makes loans in the usual course of the banking business. Augusta County is one of the largest counties in the state and the court takes notice of the well-known fact that the activity of its inhabitants is primarily in agricultural pursuits and that in volume of agricultural production it is among the leading counties of the state. It is an agricultural county. According to the last census the total population within the borders of the county (including Staunton) was somewhere around 56,000, of whom only about one-third live in any incorporated city or town. The remaining two-thirds live in the country.

It would be most surprising if a bank doing business in a county of this sort did not have any farmers among its customers; if it received no patronage from any member of a class of persons consisting of the majority of the entire population. No doubt it has many farmers among its depositors and no doubt it lends money from time to time to such of these depositors as seek loans and are financially responsible.

In the petition for review counsel for the bankrupt states that an examination of the records in the Clerk's Office of Augusta County on May 16, 1947, shows seventeen instances wherein this bank on that date held liens on farm property, livestock and equipment to secure the payment of debts owing the bank. He further states that the aggregate of the debts thus secured represents about 9% of all outstanding loans of the bank. He further states that in the eleven year period from 1935 to 1946 this bank, on approximately twenty occasions, took liens on farm property to secure debts; these liens having heretofore been satisfied and released. No evidence of these facts has been offered but the court will accept them as correct.

Taking them to be correct they appear to negative, rather than to support, the contention that this bank is "engaged in the farm-mortgage business" or the "business of financing farmers". They show that in a county whose primary industry is agriculture and where a decided majority of the population is so engaged, less than 10% of all outstanding loans of this bank are to farmers; and that in a period of twelve years the bank has taken liens on farming property in only thirty some instances—an average of about three a year. This would seem to argue that in lending money (the life-blood of every bank) it was the policy of this bank to confine the bulk of its loans to persons other than farmers; or else that the farmers of Augusta County are so fortunately situated as to seek very few loans. As a matter of fact, so far as can be judged from the brief summary of the terms of the instruments creating the liens enumerated by the bankrupt, it would appear that in most of the cases the loans when originally made were not mortgage loans or made on the strength of any lien. They appear to be instances where liens were taken to secure already existing loans in cases where, because of tardiness in payment, arising doubts as to the responsibility of endorsers or some such cause, the bank felt it wise to require this security on an outstanding debt. This may not have been the case, but even so the matter presented by the bankrupt does not, in my opinion, show that either this bank or Mr. Curry as its President was engaged in "the farm mortgage business" or "the business of financing farmers", within the common sense meaning of such terms.

The act does not provide a definition of these terms and it might be difficult to define them with exactitude. But the statute refers to engaging in the business of farm mortgages or of financing farmers. The reasonable meaning would seem to be to a business the primary purpose of which was to loan money on farm mortgages or to finance farm activities; a business the principal object and activity of which was the making of such loans. A bank which makes an occasional loan to a farmer in the course of its business and a very small proportion of whose assets are loaned to farmers could hardly be said to be engaged in the business of financing farmers; nor would the taking of an occasional lien to secure a loan made to a farmer put it into the farm-mortgage business. Most of the thousands of banks in the country make loans from time to time to persons who are farmers, and if

the contention of the bankrupt is sound then no officer, director or stockholder of any bank is eligible to serve as a conciliation commissioner. If Congress had intended to go so far it would have been very easy for it to have said so. I do not think that it did so intend.

█ Aside from the conclusion just expressed there is another consideration which requires rejection of the present effort to disqualify the conciliation commissioner. It is not going too far to say that this involves the question of whether courts are tribunals whose aim is the orderly solution of legal controversies or are mère play-grounds given over to the unrestricted display of the ingenuities and contrivances of litigants and counsel.

This proceeding was instituted on July 25, 1940, and it has been continuously before this court ever since. At the time it was instituted and referred to Mr. Curry as conciliation commissioner in July, 1940, Mr. Curry occupied the same position in connection with the Staunton National Bank which he now occupies. The nature of the business done by the bank has remained the same. Mr. Joseph I. Nachman has been the chief and only active counsel for the bankrupt since the day the proceeding began and he still is. At the time the proceeding was begun Mr. Nachman was, and had been some years, a resident of and a practicing attorney in Staunton and for the major part of the ensuing seven years he resided and practiced law in Staunton. Only within the last few years has he taken up residence elsewhere, while continuing to represent the bankrupt. At the time the proceeding was instituted and referred to Mr. Curry as conciliation commissioner Mr. Nachman had full knowledge of Mr. Curry's connection with the bank and he has had that knowledge during every minute of the seven years that this case has been in this court. I have no doubt that the bankrupt has had the same knowledge.

During this prolonged period Mr. Nachman has appeared before the conciliation commissioner on a score of occasions in connection with the proceedings; he has, on at least a half-dozen occasions, come before this court on petitions for review

of orders of the commissioner; he has been to the Circuit Court of Appeals in connection with different phases of the case on at least two occasions. The matter has been an active one abounding in controversy and requiring the decision of numerous questions. But never during these seven years until now has there been even a suggestion from either the bankrupt or her counsel that Mr. Curry was ineligible to act as conciliation commissioner. The bankrupt submitted her cause to this conciliation commissioner without question; she accepted the benefits of his orders holding her in possession of her property and restraining the pressure of her creditors; she has likewise accepted the benefits of all other orders of the commissioner and of this court which were to her favor and has submitted to those which were not. Having done so she now asks this court to hold that the commissioner is and has always been ineligible to act as such; and she asks it on the basis of facts which she and her counsel have known since the day the proceeding was begun.

The time has come to comment in plain terms upon what has long been apparent to the court. The course pursued by the bankrupt and her counsel in this case has been one of a continuous attempt at delay. There has been no thought of and no attempt to accomplish the object of the statute and stated in the petition initiating the proceeding as a desire "to effect a composition or extension of time to pay her debts". Secure in possession of her property, secure from the pressure of creditors, the bankrupt has made no efforts to rehabilitate or improve her financial situation. She has sought only to hold on to her property as long as possible and stave off the coming of the day when she must either pay her debts or have the property sold. Perhaps in taking advantage of the various opportunities for delay offered by the statute she has been within her legal rights. Perhaps her counsel has felt that it was his duty to his client to seek every chance for delay when that delay was to her advantage. The court has no means of knowing whether this attack upon the eligibility of the conciliation commissioner

is something which counsel has been carrying in mind for seven years to be brought out as a last resort and when every other delaying maneuver had been exhausted or whether it has come to mind only lately in a desperate search for something to postpone the choice which the bankrupt must inevitably face. In either event it is so plainly lacking in good faith and so obviously an attempt to further delay the cause that it would be a shocking reflection upon the processes of the courts if it was permitted to be successful. It is hardly less shocking that the attempt has been made.

### The Re-appraisement

As previously noted the three appraisers who were appointed by the commissioner on May 17, 1947, appraised the real estate of the bankrupt at $12,500.00, and on the hearing of exceptions to this report (taken by both the creditor and the bankrupt) the conciliation commissioner fixed the value at $15,000.00. Thirteen witnesses testified before the commissioner as to the value of the property; seven of these being offered by the creditor and six by the bankrupt. There is substantial agreement among these witnesses on the following facts:

The property consists of about 134 acres of land on which is located a large and well-constructed brick house containing about twenty rooms. There is also a barn of substantial size and possibly some small outbuildings of no importance. The house and barn are not of recent construction but are in a fair state of repair. The land lies a very short distance outside the town of Grottoes, one boundary of the tract being not more than one mile from the center of the town and within 400 or 500 feet of the corporate line. A hard-surfaced highway between Grottoes and the town of Weyers Cave borders the land for approximately one-half mile. The land is in a good farming section and, with the exception of about 30 acres which are rough and not subject to cultivation, the quality of the land compares favorably with other farm lands in the vicinity. However the land has not been properly cultivated or cared for during the last two or three years, due to the fact that the bankrupt practically abandoned all farming operations several years ago. The fences are in bad repair. The result is that the desirability and value of the tract for present use as a farm have been lessened somewhat by this neglect.

The witnesses were not in agreement, however, as to the value of the property. These witnesses were in the main men who appeared competent to testify on the subject before them. Some of them had had considerable experience in appraising farm lands for governmental agencies or banks; others were farmers living in the vicinity; others, while not falling in either category, were so situated as to have some knowledge of farm values in that locality. The one exception was a witness offered by the bankrupt who valued the property at $9,500.00. He was a nurseryman who had examined the property with a view to utilizing a part of it for his nursery business and whose valuation was apparently what he considered the property worth to him for that purpose. He gave little evidence of a knowledge of values from any other standpoint.

Of the remaining five witnesses offered by the bankrupt there were two who had been among the appraisers whose valuation was being attacked. They were offered by the bankrupt to support their previous appraisement of $12,500.00 and they quite naturally adhered to this figure. Of the three other witnesses offered by the bankrupt, one fixed the value at $12,000.00; one at $14,000; and one "at $15,000 or $16,000", but indicated that if the use of the land were limited to farming the value for that purpose would be around $13,000.00 or $14,000.00.

Of the witnesses offered by the creditor, two named a valuation of $25,000.00; two valued the property at $24,000.00; one at $20,000.00; one at $18,000.00; and one at $15,000.00. The latter made it clear that his valuation was based solely on the use of the property as a farm and did not take into consideration its use for any other purpose. As to all the witnesses on both sides it should be said that they did not

appear to be giving mere arbitrary and unsupported estimates. They were reasonably familiar with the land and the condition of it and of the improvements on it and they were able to give the reasons for their respective conclusions. It is somewhat noticeable, however, that in general the two groups of witnesses differed as to the basis on which valuation was reached. As previously stated the land lies just outside the corporate limits of the town of Grottoes. While still not a large place, Grottoes is a prosperous town with a growing population. It appears that a portion of the land is adapted for division into lots for residential purposes and has a present value for such purpose. In making their estimates of value it is clear that the witnesses for the creditor, with the one exception mentioned, took into consideration the proximity of the land to the town and the elements of value arising from that fact. On the contrary the witnesses for the bankrupt appear to have valued the land solely on the basis of its use as a farm and on its present condition and productivity as a farm. The valuation of the land is not, of course, to be confined by this standard of measurement. The statute directs that the appraisement be at a "fair and reasonable market value" and this implies a value which the property would realize if placed on the market, that is, a value at which it might be sold and at which persons might be willing to buy it for whatever use it was adapted or for which the purchaser might desire to put it. It would be plainly erroneous, I think, to limit the valuation to one based solely on the use of the land for farming; particularly, since it has not been used for that purpose for the past two, three or four years.

To sum up the testimony: Six witnesses offered by the creditor fixed valuations ranging from $18,000.00 to $25,000.00; and one (who valued it solely as a farm) fixed it at $15,000.00. Of the witnesses for the bankrupt, the two appraisers adhered to their valuation of $12,500.00; one witness was slightly below this at $12,000.-00; and the two others were above the appraisement, at $14,000.00 and $15,000.00 respectively. Therefore of the twelve competent witnesses who testified (excluding the nursery-man) nine, including two offered by the bankrupt, fixed the value at a higher figure than the appraisers had reported; two (the appraisers themselves) stuck to their report; and only one witness went below the appraisers—and then in only a small amount. On the basis of this testimony, the conciliation commissioner valued the property at $15,000.00. This figure is higher than that of several appraisements of the property made in past years, but it is well recognized that the market value of real estate generally has advanced of recent years. There seems no doubt also that while there has been this general advance of land values, a further enhancement of the value of this property has arisen from its proximity to the borders of a growing town.

On the basis of the evidence before the conciliation commissioner, all of which the court has gone over carefully, it cannot be said that the value of $15,000.00 fixed by the commissioner is excessive. In fact if it had been several thousand dollars higher it would have found justification in the evidence. Except where a recent sale of property in the open market has demonstrated its fair market value, any estimate of such value must necessarily be a matter of opinion as to what it may be reasonably expected to bring if sold. This cannot be determined with the complete certainty and accuracy of a mathematical problem. Within reasonable limits differences of opinion as to the value may be expected as between persons who possess identical information. In this case the commissioner quite clearly did not use any quotient method of arriving at his determination. If he had the valuation would have been substantially greater. With the opportunity to see and hear the witnesses and to evaluate the testimony he has fixed a valuation which he thought proper in view of the evidence. Even though the court may feel that this valuation is more probably inadequate than that it is excessive, it has no better way of determining this question with accuracy than the commissioner had. It is therefore not

disposed to interfere with the commissioner's finding.

■ Counsel for the bankrupt argues that the commissioner should have accepted the report of the appraisers as presumptively correct and should have sustained it in the absence of evidence that the appraisers were motivated by bias or prejudice. This is a peculiarly inappropriate argument in view of the fact that the bankrupt herself was unwilling to accept the appraisers' report, that she excepted to it, and that the hearing before the commissioner was on her exceptions as well as those of the creditor. Having attacked the report of the appraisers and taken steps to have it set aside, she now argues that it should have been taken as correct. This contention was never made before the commissioner. It is only after the commissioner's valuation proved disappointing that the bankrupt advances it. Under these circumstances it cannot be entertained; and it would be without merit in any event.

In accord with the foregoing, the prayers of both petitions for review will be denied. The order of May 17, 1947, in which the conciliation commissioner declined to disqualify himself and of which the bankrupt has sought review, will be affirmed. Likewise the order of July 10, 1947, in which the commissioner fixed the fair market value of the real estate at $15,000.-00, and review of which was sought by both creditor and the bankrupt, will be affirmed. The order of July 10, 1947, provided that the bankrupt should have thirty days from that date within which to redeem the property by paying into court the amount of the appraised value fixed by the order, less a named sum to be credited thereon. This was in accord with the mandate of the Circuit Court of Appeals. This matter will be remanded to the conciliation commissioner who will, on receipt of the order of remand, promptly notify all parties thereof and will allow thirty days from the giving of such notice within which the bankrupt may redeem on the terms provided in the order of July 10, 1947.